# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-CA-00408-COA

| | |
|---|---|
| PERRIECE COLLINS, INDIVIDUALLY AND AS THE PARENT, LEGAL GUARDIAN AND NEXT FRIEND OF SHONIQWA COLLINS, INDIVIDUALLY AND AS THE PARENT, LEGAL GUARDIAN AND ON BEHALF OF ANY AND ALL WRONGFUL DEATH BENEFICIARIES OF SHATAJA NIKEARA COLLINS, DECEASED | APPELLANTS |

v.

| | |
|---|---|
| TOIKUS WESTBROOK, M.D. | APPELLEE |

DATE OF JUDGMENT:               02/06/2013
TRIAL JUDGE:                    HON. VERNON R. COTTEN
COURT FROM WHICH APPEALED:      LEAKE COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANTS:       SHANE F. LANGSTON
                                REBECCA M. LANGSTON
                                JESSICA E. MURRAY
ATTORNEYS FOR APPELLEE:         L. CARL HAGWOOD
                                J. MICHAEL COLEMAN
NATURE OF THE CASE:             CIVIL - WRONGFUL DEATH
TRIAL COURT DISPOSITION:        DEFENDANT'S MOTION TO DISMISS
                                GRANTED
DISPOSITION:                    AFFIRMED - 12/02/2014
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**BARNES, J., FOR THE COURT:**

¶1.    Perriece Collins, the parent and legal guardian and of Shoniqwa Collins, and on behalf

of the wrongful-death beneficiaries of Shataja Nikeara Collins, filed suit in Leake County

Circuit Court against Dr. Toikus Westbrook (Dr. Toikus), among others,[1] for negligence in the delivery of Shoniqwa's stillborn baby, Shataja. Dr. Toikus filed a motion to dismiss, claiming insufficient service of process, because the person served with the complaint was his father, Dr. Jesse Westbrook (Dr. Jesse), a dentist in Germantown, Tennessee, who was not authorized to accept service for his son. The trial court agreed, finding the 120-day deadline to serve process had expired, and Plaintiffs had shown no good cause or excusable neglect as to why process had not been timely served. While this Court may not have made the same decision as the trial court, we cannot say the trial court abused its discretion. Accordingly, we affirm.

### STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶2.     On December 16, 2011, Plaintiffs filed their complaint of a wrongful-death claim due to medical malpractice against Defendants. The complaint alleged that on June 30, 2010, nineteen-year-old Shoniqwa was admitted to the Leake County Memorial Hospital emergency room under the care of its staff and Dr. Toikus, complaining of bloody discharge. Shoniqwa was approximately thirty-six weeks pregnant. Plaintiffs claimed that in spite of signs of fetal distress, neither the physician nor his nurse made any attempt to intervene or deliver the infant, and she was ultimately delivered stillborn.

¶3.     Counsel for Plaintiffs, Langston & Langston PLLC (Langston), explained that it

---

[1] Other named defendants included Leake County Memorial Hospital, the Leake County Board of Supervisors, and Edith Vowell, R.N., but the claims against these defendants are not at issue in this appeal.

2

delegated the responsibility of serving process on Defendants to its former long-time legal assistant. However, as the legal assistant was experiencing "very extreme personal problems during this period of time," lead counsel Shane Langston discovered only a few days before the expiration of the 120-day deadline, as provided by Mississippi Rule of Civil Procedure 4(h), that there had been no process served on Defendants. The trial court docket indicates that summonses for Dr. Toikus and the other defendants were not even issued until April 13, 2012, one day prior to the April 14, 2012 deadline.

¶4. On April 11, 2012, Langston hired Quantum Process, a professional process-serving company in Hattiesburg, Mississippi, to serve Defendants. Langston told Quantum Process's manager, Davy Keith, that process had to be served on Dr. Toikus on or before April 14, 2012, which was a Saturday. On April 12, 2012, at 2:55 p.m., attorney Jack Hunt, an associate at Langston, emailed Keith the notice of summons. On Friday, April 13, 2012, at 2:06 p.m., Hunt asked if Keith had "any luck so far?" At 3:23 p.m., Keith emailed Hunt and updated him on the difficulties of finding Dr. Toikus, stating "the chances of locating and serving [Dr. Toikus] today are very slim." Keith detailed that a LexisNexis search for "Toikus Westbrook" resulted in several possible addresses for him in New Orleans, Louisiana, and Germantown, Tennessee. However, eighteen minutes later, Keith sent an email stating, "I can make this happen but it's going to be more than I stated. $300. Please confirm." A confirmation email was then sent back from Hunt to Keith at 3:52 p.m., stating "everything is in motion."

¶5. Soon after sending this email, Keith testified he called a residential telephone number

3

at a location that matched Dr. Toikus's last known address in Germantown, and left a message for "Dr. Toikus Westbrook." Someone called Keith back from the number, and Keith explained he had a delivery for "Dr. Toikus Westbrook." Initially, the person responded, "he's not available." Keith then admittedly employed a technique used in his profession called a "pretext," and misrepresented to the caller that he had a delivery from "Maxim Physicians," Dr. Toikus's employer. Keith claims the person on the phone then said: "Oh, that's me. You can bring that to me." The person was on his way to Incredible Pizza in Germantown, and asked if he could meet Keith there. Keith then arranged for Gary Murphree, a process server in Memphis, Tennessee, to meet the alleged Dr. Toikus Westbrook at Incredible Pizza in Germantown.

¶6.   On Friday, April 13, Murphree arrived at Incredible Pizza and asked that the restaurant page "Toikus Westbrook."[2] An employee then escorted Murphree to a back room where a gentleman was sitting. Murphree testified when asked if he was "Toikus Westbrook," the man said "yes," and Murphree, who had the papers in a box, opened it and handed him the summons and complaint.[3] At this point, Plaintiffs claimed they believed all of Defendants had been timely served by the April 14 120-day deadline, including Dr. Toikus.

_____

[2] It is disputed whether the Incredible Pizza employee paged "Dr. Toikus Westbrook" or "Dr. Westbrook," but Plaintiffs claim this point is irrelevant because Murphree, in his affidavit, believed in good faith he served "Dr. Toikus Westbrook."

[3] On this date Murphree also executed an affidavit of service, swearing that he served the documents to "Toikus Westbrook" on April 13 at 5:23 p.m.

4

¶7.    On May 7, 2012, Dr. Toikus filed a motion to dismiss, claiming Dr. Jesse Westbrook, Dr. Toikus's father, had been served in Germantown instead of him, and therefore the complaint should be dismissed due to insufficient service of process. On May 21, 2012, an affidavit in support of the motion to dismiss, executed by Dr. Jesse on May 7, was filed with the trial court. Dr. Jesse's affidavit stated that he was a dentist, that he was served with process on April 13, and that he had no knowledge of this case. It also gave his home address in Germantown.

¶8.    In June 2012, Plaintiffs filed a response in opposition to the motion, attaching supporting affidavits from Keith and Murphree. Keith's affidavit explained how he ran a LexisNexis search to find several addresses and phone numbers for "Dr. Toikus Westbrook." Every telephone number for "Toikus Westbrook" was called, but only the caller at the Germantown phone number responded. When Keith told the caller he had a delivery for "Dr. Toikus Westbrook" from Maxim Physicians, the caller responded he was on his way to Incredible Pizza, and asked to be met there. Murphree's affidavit claimed he served who he believed was Dr. Toikus, and the person identified himself as "Dr. Toikus Westbrook" at the pizza place.

¶9.    Dr. Toikus filed a reply to Plaintiffs' response to the motion to dismiss, and attached a second affidavit by Dr. Jesse, adding more details of the events of April 14. In it, Dr. Jesse acknowledged that he had "received a telephone call at his home from a man stating he had some important documents regarding physician services for a 'Dr. Westbrook.'" Dr. Jesse claimed he identified himself as "Dr. Westbrook," and told the caller he and his family were

headed to dinner at Incredible Pizza. At the restaurant, a man approached him with a pizza box and pulled out some documents, handing them to Dr. Jesse and stating, "you have now been served."

¶10. The first hearing on the motion to dismiss was in June 2012. The hearing is not transcribed for the record, but the uncontested affidavit of Jessica Murray, counsel for Plaintiffs, stated that neither Dr. Jesse nor Dr. Toikus attended the hearing and no additional evidence was offered. The trial judge decided to continue the hearing, informing counsel that he would like to hear live testimony from the relevant witnesses.

¶11. At the second hearing on October 31, 2012, Plaintiffs called Keith and Murphree to testify, and attorney Shane Langston gave testimony about his firm's efforts to serve Dr. Toikus. The trial court granted Dr. Toikus's motion to file an affidavit, which he submitted to the court on November 26, 2012. In the affidavit, he merely stated that he was a resident of New Orleans, giving his address there, along with his father's address in Germantown, and stated he was never served with process.

¶12. On February 8, 2013, the trial court entered a judgment of dismissal in favor of Dr. Toikus.[4] The court found Dr. Toikus had not been served within the 120-day period, and

---

[4] In January 2013, the trial judge submitted a letter opinion finding against Plaintiffs. However, before a final judgment had been entered, the Mississippi Court of Appeals reversed the same trial judge's dismissal of a defendant in another case involving insufficient service of process in *Lewis v. Forest Family Practice Clinic P.A.*, 124 So. 3d 678 (Miss. Ct. App. 2013). The trial court requested the parties submit memoranda discussing the *Lewis* decision's impact. Subsequently, the Mississippi Supreme Court reversed the Court of Appeals' decision in *Lewis v. Forest Family Practice Clinic P.A.*, 124 So. 3d 654 (Miss. 2013).

Plaintiffs had shown no "good cause" or "excusable neglect" to justify an enlargement of time to serve him.[5] Plaintiffs (now Appellants) timely appealed.

## STANDARD OF REVIEW

¶13. The appellate court reviews a trial court's grant or denial of a motion to dismiss de novo. *Johnson v. Rao*, 952 So. 2d 151, 154 (¶9) (Miss. 2007). However, the "trial court's finding of fact on the existence of good cause for the delay in service of process [is] 'a discretionary ruling and entitled to deferential review' on appeal." *Triple "C" Transp. Inc. v. Dickens*, 870 So. 2d 1195, 1197 (¶15) (Miss. 2004) (citation omitted). "When reviewing fact-based findings, [the appellate court] will only examine whether the trial court abused its discretion and whether there was substantial evidence supporting the determination." *Id.* at 1197-98 (¶15).

¶14. The trial court's determination of "whether there is good cause for failure to serve process is 'a discretionary ruling on the part of the trial court and is entitled to deferential review of whether the trial court abused its discretion and whether there was substantial evidence supporting the determination.'" *Lewis Entm't Inc. v. Brady*, 142 So. 3d 396, 398 (¶6) (Miss. 2014) (quoting *Rains v. Gardner*, 731 So. 2d 1192, 1197 (¶18) (Miss. 1999)). "To the degree that a trial judge's decision to grant or deny a motion for an extension of time is based upon precept of law, the standard for the [appellate court]'s review shall be 'plenary'; otherwise, [the appellate court] shall simply apply the abuse-of-discretion

---

[5] While the trial court in its final judgment did not make a specific finding for lack of good cause, it is implicit in the ruling.

standard." *Rains*, 731 So. 2d at 1198 (¶19) (citation omitted).

## ANALYSIS

¶15.    Appellants argue that Dr. Toikus waived his defense of insufficient service of process because, until he filed an untimely affidavit after the second hearing on the motion to dismiss, the testimony had been uncontradicted that Dr. Toikus was timely served on April 13. Appellants argue that even if this Court considers Dr. Toikus's untimely affidavit, his sworn statement that he was never served with process is overcome by process servers Keith's and Murphree's affidavits, which state they thought they did serve Dr. Toikus. Appellants also claim that the trial court abused its discretion in denying their numerous requests for additional time under the "good-cause" and/or "excusable-neglect" standards.

¶16.    Rule 4(h) provides:

> If a service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint and the party on whose behalf such service was required cannot show good cause why such service was not made within that period, the action shall be dismissed.

"In order to establish that good cause exists for late service, a plaintiff must have made a diligent effort to effect service." *Foss v. Williams*, 993 So. 2d 378, 379 (¶6) (Miss. 2008) (citing *Montgomery v. SmithKline Beecham Corp.*, 910 So. 2d 541, 546 (¶15) (Miss. 2005)). Instances where good cause exists include: "[W]hen the failure is a result of the conduct of a third person; when the defendant has evaded service of process or engaged in misleading conduct; when the plaintiff has acted diligently; when there are understandable mitigating circumstances; or when the plaintiff is proceeding pro se or in forma pauperis." *Id.* (citing

8

*Holmes v. Coast Transit Auth.*, 815 So. 2d 1183, 1186 (¶12) (Miss. 2002)). If it appears that process cannot be served within the 120-day period, a diligent plaintiff should file a motion for additional time to serve process. "Such diligence would support an allegation that good cause exists for failure to serve process timely." *Stutts v. Miller*, 37 So. 3d 1, 6 (¶15) (Miss. 2010) (quoting *Montgomery*, 910 So. 2d at 545 (¶14)). "'Good cause' can never be demonstrated where plaintiff has not been diligent in attempting to serve process"; it is a strict standard.[6] *Montgomery*, 910 So. 2d at 545, 548 (¶¶13, 24).

¶17. Mississippi Rule of Civil Procedure (6)(b)(2) authorizes the trial court to enlarge the 120-day period when the request is made after this deadline upon a showing of "excusable neglect." The Mississippi Supreme Court has established that "a plaintiff attempting to establish 'good cause' must show 'at least as much as would be required to show excusable neglect, as to which simple inadvertence or mistake of counsel or ignorance of the rules usually does not suffice.'" *Stutts*, 37 So. 3d at 4 (¶9) (citing *Holmes*, 815 So. 2d at 1186 (¶11)).

---

[6] The Mississippi Supreme Court, in *Holmes*, cites Wright and Miller's Federal Practice and Procedure treatise regarding the concept of "good cause":

> [G]ood cause is likely (but not always) to be found when the plaintiff's failure to complete service in timely fashion is a result of the conduct of a third person, typically the process server, the defendant has evaded service of the process or engaged in misleading conduct, the plaintiff has acted diligently in trying to effect service or there are understandable mitigating circumstances, or the plaintiff is proceeding pro se or in forma pauperis.

*Holmes*, 815 So. 2d at 1186 (¶12) (quoting 4B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1137, at 342 (3d ed. 2000)).

9

¶18.　Appellants contend that the Westbrooks' affidavits were untimely and insufficient. They complain that in the motion to dismiss, Dr. Jesse's affidavit was not attached but promised as "forthcoming," and when the affidavit was eventually filed two weeks later, it offered no details or explanation of what Dr. Jesse said when being served, where Dr. Toikus was, or what he did with the summons after being served. Appellants also argue that Dr. Toikus never provided sworn evidence that he was not timely served with process. His affidavit, executed two weeks after the second hearing on the motion to dismiss, merely states he was never served with process. Appellants argue this is insufficient because Dr. Toikus does not offer an explanation of the telephone call with Keith, the service of process at the pizza place, or whether his father delivered the summons to him before April 14. They therefore contend the trial court abused its discretion in accepting the "bare-boned" legal conclusion that Dr. Toikus had never been served with process.

¶19.　From the record, the trial court could clearly find that Dr. Toikus was not timely served within the 120-day period. Appellants did not attempt to serve process on Dr. Toikus until two days prior to the expiration of the 120-day deadline, because Langston did not realize its legal assistant had not already served Defendants due to personal problems.[7] Then, on April 13, the process server indicated to Langston that the chances of locating and serving Dr. Toikus on that day were "very slim" because a LexisNexis search showed Dr. Toikus

---

[7] "[W]aiting until the last day to serve process on a defendant does not constitute good cause." *Long v. Mem'l Hosp. at Gulfport*, 969 So. 2d 35, 40 (¶10) (Miss. 2007) (citing *Powe v. Byrd*, 892 So. 2d 223, 227 (¶9) (Miss. 2004)).

might have more than one physical address – one in Germantown and several prior New Orleans addresses, with the latest one listed as current through April 2012. But in a subsequent email, Keith was more positive, stating he could "make it happen" and "everything is in motion." Keith contacted Dr. Toikus's employer, Maxim Physicians, who confirmed to Keith that he lived in New Orleans. However, Keith decided to pursue the Germantown address, and not the correct New Orleans address, telephone number, and email. As a result, Murphree served the wrong Dr. Westbrook (Jesse) with the complaint instead.

¶20. While a return of service gives rise to a presumption that service occurred, this presumption is rebuttable. *McCain v. Dauzat*, 791 So. 2d 839, 842 (¶8) (Miss. 2001) (citing *Pointer v. Huffman*, 509 So. 2d 870, 872 (Miss. 1987)). The presumption is rebutted solely by the testimony of the party disputing service. *Lampton-Reid Co. v. Allen*, 177 Miss. 698,714, 171 So. 780, 783-84 (1937). Dr. Toikus moved the trial court to allow him to file an affidavit, and his request was granted. The affidavit stated he had never been served with process in this case. Moreover, Dr. Jesse filed two affidavits stating that he, not Dr. Toikus, was served with process at Incredible Pizza. We find the trial court did not abuse its discretion in relying on these affidavits and in finding Dr. Toikus was not timely served.

¶21. As to whether "good cause" or "excusable neglect" was shown, Appellants first contend that they filed numerous applications for an extension of time before the trial court, which were never acknowledged, and that this was error. Appellants requested additional time in the following instances: (1) in June 2012, they requested additional time to serve Dr.

11

Toikus "in the alternative" in their response to Defendants' motion to dismiss; (2) in October 2012, during oral argument, they asked for additional time to serve Dr. Toikus, again "in the alternative"; (3) in November 2012, they included a section in their post-hearing brief about an extension of time and "good cause" shown; and (4) in December 2012, in their post-hearing rebuttal brief, they requested an extension of time.

¶22. In order for the trial court to allow an extension of time to serve process, the plaintiff must show "good cause" as to why service has not been completed *within the 120-day period* mandated by Rule 4(h) or "excusable neglect" under Rule 6(b)(2). As the trial court correctly noted in its final judgment, Appellants failed to file a motion for an extension of time *before* the 120-day deadline. Although Appellants take issue with the trial court's opinion that the email by Keith, stating that the chance of serving Dr. Toikus was "very slim," should have "raised the bar" and motivated counsel to request additional time before the expiration of the 120-day deadline, we do not find that the trial court overemphasized the earlier portion of the email in making its ruling.

¶23. Appellants cite *Jenkins v. Oswald*, 3 So. 3d 746 (Miss. 2009) to show that the lack of an application for an extension of time is not a "fatal flaw." In *Jenkins*, the plaintiff was served with process four years after the 120-day deadline. *Id.* at 747 (¶2). Evidence showed the plaintiff had attempted to serve process on the defendant at two physical addresses thought to be the defendant's dwellings, as well as attempted numerous times to locate his address for many years, without success. *Id.* at 747-48 (¶¶4-5). The plaintiff had not filed a motion for enlargement of time, but the trial court found that testimony showed "reasonably

12

diligent efforts" to serve process within the 120-day period, and "good cause" existed. *Id.* at 749 (¶11). The trial court denied the defendant's motion to quash process and dismiss, and the supreme court affirmed. *Id.* at 750-51 (¶¶15, 17).

¶24. Appellants, citing *Foss*, argue that good cause and excusable neglect existed in the instant case. In *Foss*, the plaintiff's counsel learned of local counsel's failure to serve the defendants two days before the 120-day deadline. *Foss*, 993 So. 2d at 378-79 (¶¶2, 5). All defendants were served before the 120-day deadline except one, Dr. Foss, who was served on the 121st day. *Id.* at 379 (¶2). The supreme court affirmed the trial court's denial of Dr. Foss's motion to dismiss, agreeing with the trial court's finding that there was sufficient evidence to constitute good cause. *Id.* at 380 (¶¶9-10).

¶25. We find that *Jenkins* is distinguishable from the present case because there was no difficulty in finding Dr. Toikus's address. Appellants had Dr. Toikus's correct New Orleans address, confirmed by his employer, as well as a Germantown address. The process servers chose to pursue the Germantown address, instead of New Orleans, in order to attempt service on Dr. Toikus. Keith states in his affidavit that he called every number listed for Dr. Toikus, leaving messages after receiving no answer, and that he received a return phone call back from the Germantown phone number. We note, however, that the LexisNexis search results show that the name "Westbrook Jesse L DDS/OFC" was listed beside the Tennessee phone number. Keith, therefore, should have been aware of the possibility that he was dealing with a different Dr. Westbrook. Also, the *Jenkins* court did not hold that the failure to file for an extension of time was acceptable. Rather, the trial court deemed the lack of an extension

"problematic," but the supreme court agreed with the trial court that testimony showed the plaintiff made "reasonably diligent efforts" to serve the defendant, which satisfied the good-cause standard. The efforts to serve process in *Jenkins* were much more diligent than in the instant case.

¶26. *Foss* is also distinguishable, as noted by the trial court in this case. In *Foss*, the defendant was served one day late; here, as we have already noted, Dr. Toikus was never served. Further, the plaintiff's attorney in *Foss* did not know service on the defendant was one day late until the defendant filed his motion to dismiss, prompting the plaintiff to file a motion for an extension of time. The trial court made a fact-based finding that the miscommunication between the plaintiff's attorneys over who was responsible for serving the defendant constituted good faith. Here, there was no miscommunication over who was to serve Dr. Toikus. The only miscommunication was which Dr. Westbrook was served. As Dr. Jesse was listed as the verified contact for the Germantown phone number, the process server should have been extra conscientious to serve the proper "Dr. Westbrook." The trial court correctly noted that the process server deceived Dr. Jesse into accepting service, and Plaintiffs never filed a motion requesting an extension of time.

¶27. We acknowledge that this case has numerous unfortunate and unusual facts that contributed to a lack of timely service of process. However, "[t]he burden is upon the plaintiffs to demonstrate good cause for failure to timely serve process." *Montgomery*, 910 So. 2d at 547 (¶24) (citing *Holmes*, 815 So. 2d at 1185 (¶7)). The trial court correctly noted that Appellants failed to file a motion for an extension of time prior to the 120-day deadline.

14

No attempt was made to serve process for the first 116 days. Process was issued for Dr. Toikus, and served on Dr. Jesse, on the 119th day. The process server had information that should have alerted him to the possibility he was communicating with a different "Dr. Westbrook." Bound by our standard of review, we cannot say the trial court abused its discretion in finding a lack of good cause or excusable neglect.

¶28. **THE JUDGMENT OF THE CIRCUIT COURT OF LEAKE COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.**

**GRIFFIS, P.J., ROBERTS AND MAXWELL, JJ., CONCUR. ISHEE, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION. IRVING, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY LEE, C.J., FAIR AND JAMES, JJ.; CARLTON, J., JOINS IN PART. CARLTON, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**

**IRVING, P.J., DISSENTING:**

¶29. In my judgment, the circuit court erred in finding that Collins failed to serve process on Dr. Toikus Westbrook within 120 days of the filing of her complaint. Therefore, I dissent. Even assuming that Dr. Toikus Westbrook was not served within the 120 days, I also believe that the circuit court erred in not finding good cause to grant an extension so that Dr. Toikus Westbrook could properly be served. Consequently, underlying this second issue is the following question: Whether good-faith, but unsuccessful, actions taken by a plaintiff to serve a defendant in the waning days of the initial 120-day period allowed by Rule 4 can constitute good cause for not serving the complaint and summons within the 120-day period when, during most of that period, the plaintiff failed to take any action to effectuate process—other than obtaining the summons from the clerk of the court and placing a trusted

15

paralegal in charge of getting the summons and complaint timely served. Stated another way, does the failure of a plaintiff to take any action toward effectuating service of process until the waning days of the 120-day period prevent, as a matter of law, a finding of good cause for not serving process within the 120-day period, despite the effort that was made in the last few days of the 120-day period?

¶30. Collins's counsel learned approximately four days prior to the expiration of the 120-day period that his trusted and dependable legal assistant, due to personal problems, had not effectuated process on Dr. Toikus Westbrook. Counsel sprang into action immediately, contacting a process server in Hattiesburg, Mississippi. The process server was given two addresses for Dr. Toikus Westbrook: one in Picayune, Mississippi, and one in Carthage, Mississippi. The process server attempted unsuccessfully to serve Dr. Toikus Westbrook at both addresses. What happened next is best explained by the colloquy between Collins's counsel and the Hattiesburg, Mississippi process server:

> Q.     Mr. Keith, tell Your Honor what efforts you were asked to make on behalf of my law firm to serve process on Dr. Toikus Westbrook, in or around April of this year?
>
> A.     Around April of this year, I was contacted by your law firm, Langston and Langston, to locate and serve process on a Toikus Westbrook. If I [re]call there were several – –
>
> THE COURT:     Let's refer to them as junior and senior, so we'll be sure – – or can we not?
>
> MR. LANGSTON:  Your Honor, it's not junior and senior.
>
> THE COURT:     All right. What is it?

16

MR. LANGSTON: The father is Jesse Westbrook and this gentleman is Toikus Westbrook. So there aren't two Toikuses, I'm sorry.

THE COURT: Dr. Jesse Westbrook is the father's name; is that right?

MR. LANGSTON: Yes, sir. He's a dentist, so I understand.

THE COURT: All right.

A. I was given, I believe, it was two addresses initially. One was in Picayune and one was in Carthage, if I'm not mistaken. We attempted to serve process on Dr. Toikus Westbrook at both of those locations. He was at neither address. I did further research in order to obtain a current address for Dr. Westbrook.

Q. (By Mr. Langston) What kind of research did you do?

A. It's commonly referred to as a locator or a skip trace, and it's basically research, computer research that shows reported addresses of people that reside at a given address. It's based on – – we call credit header information. And when I did a search by the name of Toikus Westbrook, using his past known addresses as a template or as a method to link a newer address, I discovered an address for him in Germantown, Tennesssee. I obtained a phone number to the address in Germantown, Tennessee, and called. I believe I called and left a message for Dr. Toikus Westbrook. Someone called me back and ultimately identified himself as Dr. Toikus Westbrook. I advised him that I had a delivery for him. He said, you can – – I'm going to be leaving my home address. You can have someone meet me at a pizza parlor – –

Q. All right. Let me back up just a moment. In that conversation you had, this was a return call you got; is that correct?

A. Yes, sir.

Q. And the return caller, when you answered the telephone, how did he identify himself?

A. The conversation was had, and I told him that I had a delivery for Dr.

17

Toikus Westbrook.

Q. What did he say originally?

A. He – – when I told him that, he said, he's not available.

Q. Okay.

A. And I said, well, I've got to give this to him. He's got to sign for it. And he said, well, what is it about. And I told him it was something to do with a physician. I had found information that Dr. Westbrook was affiliated with the Maxim Physicians. Now, in my experience, I basically told him that I had a delivery regarding Maxim Physicians.

Q. Okay. And so what did he say after that?

A. He said, oh, that's me. You can bring that to me. And I said, okay. He said, I – – that's me, as in I am Dr. Toikus Westbrook.

Q. Right.

A. And I said, okay, I can have someone over at your house within a – – within the hour. And he stated, well, I'm leaving, going to some pizza place. He gave me the address he also gave me his cell phone number. It was at that time that I contacted my Memphis, Tennessee process server, which is Mr. Gary Murphree, and advised him that we – – I had a paper that needed to be served on a Dr. Toikus Westbrook, and he'd given the information that he would meet him at the said pizza place.

Q. All right. So you asked him to then – –

A. I asked him then to go to the pizza place and identify Dr. Toikus Westbrook and serve him the papers.

Q. And do your notes identified [sic] on what day that service at that pizza restaurant, was accomplished?

A. It was – – I believe that's going to be April – – I mean, excuse me, July – –

Q. Well, all right.

18

MR. LANGSTON: We've admitted it into evidence, Your Honor. The proof of service.

THE COURT: The Affidavit?

MR. LANGSTON: So the date speaks for itself, but – –

THE COURT: May I see the – – Shane, would you hand it to me.

MR. LANGSTON: April 13th.

THE COURT: This would be Exhibit 1, I believe. Is this it?

A. Yes, sir, Your Honor, I don't believe I've seen that Affidavit. But that's not mine.

THE COURT: Okay.

MR. LANGSTON: And, Your Honor, for the record, that is within the 10 day period.

THE COURT: So noted.

Q. (By Mr. Langston) All right. Did you bring with you the computer printout that you served for Dr. Toikus Westbrook?

A. Yes, sir, I did.

Q. Okay.

MR. LANGSTON: And, Your Honor, I don't have an extra copy of it. Opposite counsel's welcome to see it, but I'd like to offer that into evidence.

THE COURT: Any objection?

MR. HAGWOOD: Let me see it first. I haven't seen it. May I look at it first?

THE COURT: Okay.

19

MR. HAGWOOD: If we're just going to identify it, I'll have to ask questions about it.

THE COURT: You want it to be marked for identification? Le it be marked for identification.

(Exhibit No. 5 marked for identification only and attached hereto)

Q. (By Mr. Langston) Okay. Mr. Keith, will you identify the exhibit that was just marked?

A. Yes, sir.

Q. What is that?

A. This is a print-out of the research that I conducted in order to find a valid address for Dr. Toikus Westbrook. I have an account with LexisNexis. If you have an authorized purpose to look for an address belonging to any particular person, in this case the authorized purpose was Service of Legal Process. It will allow you to search by the name, Social Security number, address, et cetera. As I mentioned earlier, I took the addresses that we knew to be valid for him, he was just no longer there, or a past address, and linked it to a address that came up as the top reported address for a current address for Dr. Westbrook.

Q. What address is that?

A. 1666 Newsome Drive, Germantown, Tennessee. It was reported as being current from 1992 to April '12.

Q. April 12, 2012?

A. I'm sorry, April of 2012. It doesn't give specific dates.

Q. Okay.

A. Or days.

Q. All right. And is that the address that you called – –

20

A.    It is.

Q.    – – and the man identified himself as Dr. Toikus Westbrook?

A.    Yes, sir.

MR. LANGSTON:          No further questions, Your Honor.

¶31.  The Memphis, Tennessee process server testified as follows:

Q.    And Mr. Murphree, do you recall in or around April of 2012, you were asked to deliver process to Dr. Toikus Westbrook?

A.    Yes, I do.

Q.    And tell Your Honor what you were asked to do, who asked you?

A.    David Keith's company called me and asked me to serve a paper, told me where the person would be, what time the person would be there. I got the papers in hand, went down to the place of – –

Q.    Where did you go?

A.    It was a pizza place.

Q.    Incredible Pizza?

A.    Incredible Pizza was the name of it. It was in – – off of Germantown Road there in Memphis, Tennessee.

Q.    And tell Your Honor what you did after you got there.

A.    When I got there, I had one of the employees to page . . . Toikus Westbrook. A black female lady came out and she took me back to the – – there was a little room back there and there was a gentleman sitting there. I asked him if he was Toikus Westbrook; he said yes. I had the papers in a box. I opened the box, I handed him the papers, and I left.

MR. LANGSTON:  No further questions.

In addition to providing the testimonies set forth above, both of the process servers gave

21

affidavits containing essentially the same information as testified to, although the live testimony was a bit more expansive.

¶32. Neither Dr. Jesse Westbrook nor Dr. Toikus Westbrook testified concerning what happened during the effort to serve Dr. Toikus Westbrook, choosing instead to submit an affidavit. However, Dr. Toikus Westbrook's affidavit was not submitted until approximately two weeks after the hearing on the motion to dismiss had been held. In Dr. Jesse Westbrook's affidavit, he stated that his home address was 1666 Newsum Drive, Germantown, Tennessee, that he was served with process in the instant case on or about April 14, 2012, and that he had no personal knowledge of the case other than his son was named Toikus Westbrook. In Dr. Toikus Westbrook's affidavit filed on November 26, 2012, he stated that his current address had been 1542 Debattista Place, New Orleans, Louisiana, since 2005; that his residence telephone number in New Orleans, Louisiana, had been 504-365-2153 since 2005; that his father is Jesse Westbrook and that his father's address is 1666 Newsum Drive, Germantown, Tennessee; that he had never been served with process in this case.

¶33. Based upon this testimony and the affidavits of Drs. Jesse and Toikus Westbrook, the circuit court found:

> The Court finds that from December 16, 2011, when the Complaint was filed, until April 14, 2012, the expiration of the 120-day time period, no application was made to this Court that good cause existed for the Court to grant an extension of time to serve Dr. Toikus Westbrook, nor has any application been made for extension, to this date.
>
> On April 12, 2012, Mr. Robert David Keith, II, a process server hired by

22

Plaintiffs' counsel, began the process of serving Dr. Toikus Westbrook. On April 13, 2012, the process server emailed information to the Langston firm, Plaintiffs' counsel, detailing that Dr. Toikus Westbrook may have more than one physical address including Germantown, Tennessee, and New Orleans, Louisiana, and specifically noted that, "I think the chances of locating and serving him today are very slim." It further appears that after receiving notice from the process server that "the chances of locating and serving Dr. Toikus Westbrook today are very slim," Plaintiff failed to file a motion for extension of time to serve Dr. Toikus Westbrook.

As pointed out by Plaintiffs' counsel during the hearing of this matter, he had tasked a former legal assistant, who was experiencing some personal problems, with making sure that process was served within the one hundred twenty (120) day period. Plaintiff argued that they acted in good faith during the one hundred twenty (120) service period and believed that they had served process on Dr. Toikus Westbrook until they learned otherwise.

This Court finds that once process server, Davy Keith, had located an address for Dr. Toikus Westbrook in Germantown, Tennessee, he contacted Gary Murphree, a process server in Germantown, Tennessee, to serve process on Dr. Toikus Westbrook. Mr. Keith called Dr. Jesse Westbrook and left a message. Thereafter, Dr. Jesse Westbrook returned Mr. Keith's call and told Mr. Keith that Dr. Toikus Westbrook was "not available." Mr. Keith explained that he had a delivery for Dr. Toikus Westbrook from Dr. Toikus Westbrook's employer, Maxim Physicians. Although the dialogue between Mr. Murphree and Dr. Jesse Westbrook at the pizza parlor where they met is disputed, Plaintiffs assert that Dr. Jesse Westbrook told him he was Dr. Toikus Westbrook. However, on cross-examination, Mr. Murphree acknowledged that their strategy was a subterfuge designed to deceive Dr. Jesse Westbrook to induce him to appear at the pizza parlor to receive the summons. In addition, Dr. Jesse Westbrook testified by affidavit that Mr. Mumphree asked him if he was "Dr. Westbrook," who, of course, he is.

At this time, Mr. Murphree then served Dr. Jesse Westbrook with the summons, which was enclosed in a box, and left.

¶34. It is clear to me that the circuit court in making its findings of fact overlooked key pieces of evidence and misquoted others. First, there is no evidence in this record to support the circuit court's finding that Dr. Jesse Westbrook returned Davy's call. According to

23

Davy's testimony, he called the telephone number for the Germantown address and left a message for *Dr. Toikus Westbrook*. "Someone called back and *ultimately identified himself as Dr. Toikus Westbrook*." (emphasis added). Neither Dr. Jesse Westbrook's nor Dr. Toikus Westbrook's affidavit addresses this conversation. Therefore, there is no basis in this record for the trial court's finding that *Dr. Jesse Westbrook returned the call*. Accepting as a fact that Dr. Toikus Westbook does not live at, and has not ever lived at, 1666 Newsum Drive, Germantown, Tennessee, does not prove that he was not present at that address when (1) the telephone call was made, (2) the telephone call was returned, (3) and the summons and complaint were served at the pizza establishment. There is no evidence in the record as to Dr. Toikus Westbrook's whereabouts on April 13, 2012.

¶35. The circuit court also found that the Tennessee process server served Dr. Jesse Westbrook on April 13, 2012. Again, there is no evidence in the record to support this finding. While it is not disputed that someone was served at the pizza establishment, there is no evidence in this record to support the circuit court's finding that the process server served Dr. Jesse Westbrook at the Pizza establishment. Neither Dr. Jesse Westbrook nor Dr. Toikus Westbrook, in his affidavit, identifies the place where Dr. Jesse Westbrook was allegedly served with process. The only evidence in the record as to where any service took place and who was served came from the Tennessee process server, who, as stated, testified as follows:

> When I got there, I had one of the employees to page . . . Toikus Westbrook. A black female lady came out and she took me back to the – – there was a little room back there and there was a gentleman sitting there. *I asked him if he was*

*Toikus Westbrook; he said "yes."* I had the papers in a box. I opened the box, I handed him the papers, and I left.

(Emphasis added).

¶36. Finally, as noted, the circuit court found:

However, on cross-examination, Mr. Murphree acknowledged *that their strategy was a subterfuge designed to deceive Dr. Jesse Westbrook to induce him to appear at the pizza parlor to receive the summons. In addition, Dr. Jesse Westbrook testified by affidavit that Mr. Mumphree asked him if he was "Dr. Westbrook*," who, of course, he is.

(Emphasis added). I find nothing in the record to support this finding. First, why would Collins's counsel want to induce Dr. Jesse Westbrook to appear at the pizza parlor to receive the summons? Any summons received there by Dr. Jesse Westbrook would not have effectuated service on Dr. Toikus Westbrook. Second, with due respect to the circuit court, Dr. Jesse Westbrook did not testify by affidavit that Mr. Mumphree asked him if he was Dr. Westbrook. As noted, neither Dr. Jesse nor Dr Toikus Westbrooks describes in his affidavit what happened at the pizza establishment.

¶37. For the reasons presented, I find the circuit court's finding—that the Tennessee process server served Dr. Jesse Westbrook, not Dr. Toikus Westbrook—is not supported by substantial evidence. Therefore, I would reverse and render the judgment of the circuit court and remand this case for further proceedings. Alternatively, I would find that Collins proved good cause for an extension of time to serve Dr. Toikus Westbrook, assuming he was not in fact served on April 13, 2012. Despite the circuit court's finding that Collins never filed a motion for extension of time, it is clear from the record that Collins asked for such relief,

although admittedly not via a motion. In Collins's rebuttal to Dr. Toikus Westbrook's brief in support of his motion to dismiss, Collins concluded: "Plaintiffs therefore respectfully request this court to deny defendants['] motion to dismiss and grant to plaintiffs an extension of time to serve the Defendant, Dr. Toikus Westbrook." Such an extension could have and should have been granted under the authority of *Foss v. Williams*, 993 So. 2d 378 (Miss. 2008).

**LEE, C.J., FAIR AND JAMES, JJ., JOIN THIS OPINION. CARLTON, J., JOINS THIS OPINION IN PART.**